UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE WELFARE FUND OF PLUMBERS LOCAL UNION NO. 200, Individually and on Behalf of All Others Similarly Situated, | ) | Civ. Action No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND STATE ANTITRUST AND CONSUMER PROTECTION STATUTES |
| vs. | ) | |
| JOHNSON & JOHNSON and JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

The Welfare Fund of Plumbers Local Union No. 200 ("the Fund"), on its own behalf and on behalf of all persons or entities similarly situated, brings this Complaint against Defendants Johnson & Johnson and Janssen Biotech, Inc. ("J&J" or "Defendants"), and based on personal knowledge as to the facts that pertain to itself and otherwise on information and belief hereby alleges:

## INTRODUCTION

1.       Remicade (a.k.a. infliximab) is a biologic medication manufactured by Johnson & Johnson ("J&J") that provides essential treatment for millions of persons in the United States and worldwide with debilitating inflammatory diseases, such as Crohn's Disease, ulcerative colitis and rheumatoid arthritis.  For many years, J&J's Remicade held a monopoly for all infliximab biologic medications, due to J&J's patented position, making Remicade, with its nearly $5 billion annual market, J&J's premier medication.  In 2016, with the expiration of J&J's patents, Pfizer introduced a competing infliximab product, Inflectra.  This was followed in 2017 by another biosimilar infliximab product, Renflexis, manufactured by Samsung Bioepis.  In an effort to maintain and extend its monopoly in the market for Remicade and to suppress competition and maintain prices to Remicade purchasers above the competitive level that would have prevailed with the advent of effective competition by biosimilar providers, J&J implemented an extensive, anti-competitive scheme, through a web of exclusionary contracts with both health insurers and healthcare providers.  J&J called its exclusionary scheme its "Biosimilar Readiness Plan".

2.       With the entry into the market of a competitor, prices of the incumbent biologic should fall.  Instead, the opposite occurred in the infliximab market.  Since the time the Food and Drug Administration ("FDA") approved Pfizer's Inflectra and J&J implemented its plan to block biosimilars like Inflectra, J&J has raised the list price of Remicade by close to 9% and increased

the amount the U.S. government reimburses (through medicare) for Remicade by more than $190 per infused dose.   J&J's list price increases are not overcome by increased rebates and discounts:  Remicade's "average selling price" ("ASP") – which is an average of a drug's pricing after taking into account discounts, rebates and other price concessions – has increased since Inflectra's entry.   As of September 2017, Remicade's ASP was more than 10% higher than Inflectra's ASP.

3.        This is because J&J's exclusionary "Biosimilar Readiness Plan" scheme worked. Despite being priced well below the prices charged by J&J for Remicade, neither Pfizer's Inflectra nor Samsung Bioepsis's Renflexis, has been able to gain any appreciable market share and J&J has been able to maintain, even increase by as much as 9%, the prices it charges for Remicade.  As a consequence, patients throughout the United States who rely on Remicade for necessary treatment were and are charged inflated, supra-competitive prices.  This lawsuit seeks equitable relief to dismantle J&J's illegal, anti-competitive scheme as well as damages for the overcharges imposed on the Fund and all other similarly-situated, indirect purchasers who paid for, or reimbursed persons who paid for, Remicaid treatments.

4.        J&J's exclusionary "Biosimilar Readiness Plan" took several forms.  J&J entered into agreements with insurance companies that either involved an explicit commitment not to reimburse for other biosimilars or, alternatively, make coverage practicably impossible, effectively making Remicade the only covered infliximab.  J&J has been able to coerce insurers into accepting these exclusionary contract terms by threatening to deny rebates to insurers that decline J&J's exclusivity commitments.  Insurer decisions regarding reimbursement policies have a significant impact on which infliximab product will be stocked by healthcare providers such as hospitals and clinics.  Because infliximabs are infusion products, providers administer them on site and the

providers must use their own funds to stock the product, purchasing it for later use and relying on subsequent reimbursement from insurers or other third-party payers to recoup their expenses. Given the high cost of biologic drugs generally, and Remicade in particular (in the thousands of dollars per dosage), providers are unwilling pay for a product that is not widely covered by insurers for fear of not being reimbursed for its out-of-pocket purchase expense after the provider administers the infliximab to a patient.

5.      J&J has touted its success, noting that it had not "seen much of an impact" from Inflectra's entrance, and that J&J is "especially well-prepared to manage through the Remicade biosimilars." J&J also expressed confidence that it could fend off subsequent biosimilar entrants, including Renflexis, because of its exclusionary contracts:  "[W]e have our contracting in place with all the managed care organizations [*e.g.*, health insurers]." The result is that the Fund (along with healthcare providers and the U.S. government) has fewer choices and pays more for Remicade than it should.

6.      In addition to its exclusionary, competition-killing contracts with insurers, J&J entered into exclusionary contracts with providers (*e.g.*, clinics, hospitals, etc.) by offering rebates and/or discounts on Remicade, but only if the provider committed to buy Remicade for nearly all of its infliximab needs, thereby excluding biosimilars like Inflectra or Renflexis.

**PARTIES**

7.      The Welfare Fund of Plumbers Local Union No. 200 is an "employee welfare benefit plan" under the Employee Retirement Income Security Act and a jointly managed multi-employer plan under the National Labor Relations Act. It represents hundreds of employees and their dependents in the State of New York on whose behalf health benefits are provided on a self-funded and insured basis. Medical benefits on a self-funded basis are provided through

4

MagnaCare and pharmaceutical benefits on a self-funded basis are provided through Express Scripts. Plaintiff is not generally aware from what source Express Scripts purchases its products. Plaintiff is headquartered in Ronkonkoma, New York. During the period from April 5, 2016 to the present the Welfare Fund of Plumbers Local Union No. 200 paid for or made reimbursement for Remicade on behalf of participants who received Remicade treatment in New York.

8.     Defendant J&J is a corporation organized and existing under the laws of New Jersey with its principal place of business in the United States at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J is an international pharmaceutical company – one of the largest in the world – and was the sole supplier of infliximab, marketed as Remicade, between 1998 and 2016.

9.     Defendant Janssen Biotech, Inc. ("Janssen"), a wholly owned subsidiary of J&J, is a corporation organized and existing under the laws of Pennsylvania with its principal place of business at 800 Ridgeview Drive, Horsham, Pennsylvania 19044. Janssen co-owns or has licenses to the Remicade patents and performs the marketing for Remicade in the United States.

10.     The parties listed as defendants in paragraphs 8 and 9, above, are collectively referred to herein as "Defendants" or "J&J".

## JURISDICTION AND VENUE

11.     This Court has original federal question jurisdiction over the Sherman Antitrust Act ("Sherman Act") claims asserted in this Complaint pursuant to 28 U.S.C. §§1331 and 1337 and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. This Court also has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class is different from that of any defendant. The $5

million amount in controversy and diverse citizenship requirements of CAFA are satisfied in this case.

12.    Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22), and 28 U.S.C. §§1391(b)-(d), because a substantial part of the events giving rise to the Fund's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, Defendants reside in, are licensed to do business in, are doing business in, have agents in, or are found or transact business in, this District.

13.    This Court has personal jurisdiction over of the Defendants because, *inter alia*, each of the Defendants:  (a) transacted business throughout the United States, including in this District; (b) marketed and sold Remicade throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in illegal conduct that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

14.    The activities of Defendants are and at all relevant times were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.  The creation, marketing, sale and distribution of Remicade and the actions complained of in this complaint occur in and substantially affect interstate commerce.

## CLASS ACTION ALLEGATIONS

15.    The Fund brings this action on its own behalf and also on behalf of two classes as set forth, below, in paragraphs 16 and 17.

16.    The Fund brings this action individually and as a class action under Rule 23(a) and

(b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of

the following class (the "Injunction Class"):

> All persons and entities in the United States, as defined herein, who indirectly
> purchased, paid and/or provided reimbursement for some or all of the purchase
> price of Defendants' infliximab from April 5, 2016 through the present (the "Class
> Period").    This class excludes: (a) Defendants, their officers, directors,
> management, employees, subsidiaries and affiliates; (b) all federal and state
> governmental entities except for cities, towns or municipalities with self-funded
> prescription drug plans; (c) all persons or entities who purchased defendants'
> infliximab for purposes of resale or directly from Defendants; (d) fully insured
> health plans (*i.e.*, health plans that purchased insurance covering 100% of their
> reimbursement obligation to members); (e) any "flat co-pay" consumers whose
> purchases of Defendants' infliximab were paid in part by a third-party payor and
> whose co-payment was the same regardless of the retail purchase price; and (f) any
> judges or justices involved in this action and any members of their immediate
> families.

17.    The Fund also brings this action individually and as a class action under Rule

23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages on behalf of the

following class (the "Damages Class"):

> All persons and entities who paid for or provided reimbursement for indirect
> purchases of Defendants' infliximab from April 5, 2016 through the present (the
> "Class Period") in the following jurisdictions:  Alabama, Arizona, California, the
> District of Columbia, Guam, Hawaii, Iowa, Maine, Michigan, Minnesota,
> Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina,
> North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, the U.S. Virgin
> Islands, Vermont, West Virginia and Wisconsin.    This class excludes: (a)
> Defendants, their officers, directors, management, employees, subsidiaries and
> affiliates; (b) all federal and state governmental entities except for cities, towns or
> municipalities with self-funded prescription drug plans; (c) all persons or entities
> who purchased defendants' infliximab for purposes of resale or directly from
> Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased
> insurance covering 100% of their reimbursement obligation to members); (e) any
> "flat co-pay" consumers whose purchases of Defendants' infliximab were paid in
> part by a third-party payor and whose co-payment was the same regardless of the
> retail purchase price; and (f) any judges or justices involved in this action and any
> members of their immediate families.

18.     While the Fund does not know the exact number of the members of the Classes, the Fund believes there are at least thousands of members in each Class.

19.     Common questions of law and fact exist as to all members of each of the Classes, thereby making relief appropriate with respect to each of the Classes as a whole.  Questions of law and fact common to each of the Classes, among others, include:

(a)     Whether Defendants unlawfully excluded competition for biosimilar infliximab;

(b)     The identity and participants in the scheme;

(c)     The duration of the alleged scheme and the acts carried out by Defendants in furtherance of the alleged conduct;

(d)     Whether the alleged conduct violated the Sherman Act;

(e)     Whether the alleged scheme violated various state antitrust and consumer protection statutes;

(f)     Whether the alleged scheme caused injury to competition in the infliximab market;

(g)     Whether Defendants' conduct caused injury to the business or property of the Fund and members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Defendants' infliximab in the United States during the Class Period;

(i)     The appropriate injunctive relief for the Injunction and Damages Classes; and

(j)     The class-wide measure of damages appropriate for the Damages Class.

20.    The Fund's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  The Fund's interests are coincident with, and not antagonistic to, those of the other members of the Classes.  The Fund is represented by counsel who are competent and experienced in the prosecution of antitrust, consumer protection and class action litigation.

21.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

22.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

23.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, creating the potential for incompatible standards of conduct for Defendants.

## FACTUAL BACKGROUND

**The Infliximab Market and Its Regulation**

24.    Congress recognized the growing importance of biologics, as well as the growing costs associated with them, when it passed The Patient Protection and Affordable Care Act, signed

into law by President Obama on March 23, 2010.  As part of that Act, Congress amended the Public Health Service Act ("PHS Act"), enacting the Biologics Price Competition and Innovation Act ("BPCIA") to create an abbreviated approval pathway for biological products that are demonstrated to be "highly similar" (biosimilar) to or "interchangeable" with an FDA approved biological product.  The purpose of the BPCIA is to foster meaningful price competition for long-entrenched branded biologic products – with the ultimate goal of lowering healthcare costs.  To facilitate price competition, the BPCIA provides an abbreviated FDA approval pathway for biosimilar versions of branded biologic drugs.  Biosimilars are products that the FDA has determined to have "no clinically meaningful differences" from the already approved biologic (sometimes referred to as the "reference listed drug" or "RLD") in terms of safety, purity and potency.

25.    The goal of the BPCIA is similar, in concept, to that of the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), which created abbreviated FDA pathways for the approval of drug products.  The BPCIA aligns with the FDA's longstanding policy of permitting appropriate reliance on what is already known about a drug, thereby saving time and resources and avoiding unnecessary duplication of human or animal testing.

26.    Under the BPCIA, a sponsor may seek approval of a "biosimilar" product under the new §351(k) of the PHS Act.  A biological product may be demonstrated to be "biosimilar" if data show that the product is "highly similar" to the reference product notwithstanding minor differences in clinically inactive components and that there are no clinically meaningful differences between the biological product and the reference product in terms of safety, purity and potency.

27.    In order to meet the higher standard of interchangeability, a sponsor must demonstrate that the biosimilar product can be expected to produce the same clinical result as the reference product in any given patient and, for a biological product that is administered more than once, that the risk of alternating or switching between use of the biosimilar product and the reference product is not greater than the risk of maintaining the patient on the reference product. Interchangeable products may be substituted for the reference product by a pharmacist without the intervention of the prescribing healthcare provider.

28.    Inflectra and Renflexis are currently treated as "highly similar" or "biosimilar" to Remicade in the infliximab market.

29.    The relevant product market is the market for biologic infliximab (the "Relevant Product Market"). Because of the heightened effectiveness of the biologic infliximab – compared to its biologic competitors and prescription drug analogs – for its relevant indications, those competitors and analogs are not substitutes. The non-infusion products approved for the indications relevant to infliximab include oral medications (*e.g.*, Xeljanz) and self-injectables (*e.g.*, Humira, Enbrel). These products are patient-administered. Infliximab, by contrast, must be delivered by healthcare professionals in a clinical setting (*e.g.*, hospitals or infusion centers) during infusion sessions that take upwards of two hours. Physicians are not likely to switch from prescribing their patients infliximab to prescribing those non-infusion products in response to a small but significant non-transitory change in the price of infliximab. None of those drug or biologic alternatives to infliximab significantly constrains the prices J&J is able to charge for Remicade. The pricing of infliximab bears this out: despite increased prices for Remicade, its sales have not declined. Remicade has over a 90% share of this market.

30.    The relevant geographic market for the Relevant Product Market alleged herein is the United States of America and its possessions and territories, as these products are marketed and sold on a national basis.

31.    Substantial barriers to entry exist to developing other infusion-administered drug therapies for the indications relevant to infliximabs.  The development of a new therapy requires tens if not hundreds of millions of dollars and substantial risk, as any new product must survive years of research and development, clinical trials and FDA approval.  If left unchecked, J&J's conduct will serve as an additional barrier to entry, as potential new entrants will recognize that they will be unable to break J&J's "rebate trap" and thus be unable to profitably enter the Relevant Product Market – and consequently will not invest the resources necessary to develop biosimilars.

32.    Monopoly power is the ability of a single seller to raise prices above the competitive price level without losing significant business.  J&J has market power in the Relevant Product Market.

33.    For years before Inflectra's entry, J&J's ASP for Remicade increased, yet Remicade did not lose business. Between 2007 and 2017, Remicade's ASP increased more than 62%.  Despite Remicade's price hikes, unit sales of Remicade have actually grown 15% during the period from 2012 to 2016.

34.    The introduction of Pfizer's competing Inflectra product has not eroded Remicade's monopoly power.  Instead, since Inflectra was launched, Remicade's ASP has increased without affecting its market position.  Ten months after Inflectra's introduction, Remicade still accounted for more than 96% of all infliximab sales.

**Insurance Coverage Is Critical in the Infliximab Market**

35.    Most of the people who are prescribed Remicade have insurance or qualify for patient assistance.  Insurance coverage and reimbursement are key to the adoption by a provider

of an expensive product (like Remicade) because patients will likely not pay for them out of pocket.  Because the biologic medication is not one that can be picked up at a pharmacy, but is administered intravenously in a clinic or other institutional setting, it generally is not included under the "pharmacy benefit" of most health plans.  In the pharmacy benefit setting, physicians prescribe a drug and the patient procures the medication himself or herself at the pharmacy, paying for it with a combination of insurance coverage (either private or government-sponsored) and an out-of-pocket payment (usually a co-pay).  In the pharmacy benefit context, neither the prescribing physician nor the institution with which the physician is affiliated bears financial risk with respect to the drug selected, *i.e.*, the drug is not purchased and stocked in advance by providers at their own cost.  The pharmacy buys the drug, dispenses it, and is reimbursed.

36.    By contrast, products such as Remicade, sometimes referred to as "medical benefit" products, are administered at a clinic or other healthcare provider site and the provider itself first purchases with its own funds the drug product for use in the infusion treatment of patients, and then later seeks reimbursement for the drug from a third-party payer (a practice commonly referred to as "buy and bill").  When a treatment is administered, the provider must then secure payment for the service, including the cost of the product dispensed.  In this context, the provider has a strong incentive to use medications that are widely covered by insurance, particularly by the major national commercial health insurers and significant regional insurers active in its area.

37.    If a drug product is not widely covered, there is an increased risk that coverage might be denied, leaving the providers that paid for the product up front with the potential financial loss, since it would be unlikely that the patient would be a source of reimbursement.  Providers therefore are much less likely to purchase a product that is not widely covered by insurance.

38.    Commercial insurers typically publish medical policies enumerating the drug products they will cover under the medical benefit and the terms under which they will do so.  For example, medical policies may exclude drugs from coverage or they may dictate restrictions on use.  Drug manufacturers compete, usually with rebates or other price concessions, to obtain coverage under insurer medical policies and to have either fewer restrictions on reimbursement than their competitors or, at a minimum, to achieve "parity," whereby the competing products have the same restrictions on reimbursement and the patient and/or doctor can choose between them.  Securing at least parity placement is critical, especially for new products seeking to gain traction in the marketplace, and particularly with large insurers, which have tens of millions of covered patients.

**J&J's Exclusionary Scheme**

39.    Part of J&J's exclusionary scheme was revealed in a conference call with analysts.  Joaquin Duato, worldwide chairman of J&J's pharmaceuticals group, told analysts that the company was gearing up for Pfizer's competing product to Remicade with a "focused biosimilar readiness plan."  That plan included trying to delay Pfizer's launch via an appeals process, as well as sending out its sales reps to preach the superiority of Remicade's scientific track record and J&J's extensive patient-assistance program.  J&J claimed that "70% of patients who are stable on Remicade are highly unlikely to switch."

40.    J&J also touted to analysts that it "plans to leverage innovative contracting strategies in all channels to fully compete with biosimilars."  These so-called innovated strategies ensured that other competing entrants – like Pfizer and Samsung Bioepis – would be unable to gain a foothold in the market.  Analysts were confident that the plan would succeed noting that the company "should be able to navigate the threats from the biosimilar entry without any significant

share loss in the next 12 months." This was the case even though both Samsung Bioepis's and Pfizer's products were priced significantly below J&J's Remicade.

41.    J&J induced most major health insurers – covering at least 70% of commercially insured patients in the United States – to adopt in their insurance contracts exclusivity restrictions and to impose outright bans on competing biosimilars' coverage or so-called "fail first" requirements.

42.    For example, Cigna and UnitedHealthcare adopted "fail first" requirements, while Anthem excluded Pfizer's product altogether. Aetna adopted a complex set of rules that operated in practice like the "fail first" requirements of Cigna and UnitedHealth. These health insurers cover millions of Americans.

43.    Other regional insurers, like certain Blue Cross Blue Shield insurers, have similar "fail first" requirements in place. The "fail first" exception requires that Remicade has been tried by the provider and has failed with respect to a given patient before a biosimilar infliximab can be reimbursed. Those regional insurers cover millions of patients.

44.    After Inflectra's FDA approval in April 2016, and before J&J implemented its exclusionary contracts, health insurers undertook reviews to determine whether there was a medical reason not to reimburse Inflectra or to disfavor it relative to other therapies. Following these reviews, several major health insurance companies – including at least Aetna, Anthem and UnitedHealthcare – classified Inflectra at parity with Remicade, confirming that there was no medical reason justifying a restrictive reimbursement policy toward Inflectra. Thus, for example, in October 2016, UnitedHealthcare, the nation's largest health insurer, with more than 30 million covered commercial medical patients, published an update to its medical and site of care policies classifying Inflectra at parity with Remicade for the approved indications (with an effective date

of November 1, 2016).  This meant that, for UnitedHealthcare, Inflectra would be reimbursed freely and would not be disfavored relative to Remicade.  With insurance coverage "at parity" with Remicade, the stage was set for Inflectra to compete head-to-head with Remicade on a level playing field – and for purchasers to receive the benefits of competition:  greater choice and lower prices.

45.    Circumstances changed, however. Just weeks later, UnitedHealthcare reversed course, classifying Remicade as its "preferred" product and instructing that Inflectra would be eligible for reimbursement only in circumstances so limited as to be practically non-existent.  This change occurred after J&J induced UnitedHealthcare to enter into an exclusive deal by threatening to penalize UnitedHealthcare with the loss of significant rebates unless UnitedHealthcare agreed to deny coverage of Inflectra.  Under UnitedHealthcare's new policy, Inflectra could be reimbursed only where the following conditions were met:  (a) the patient must show a minimal clinical response, or an intolerance or adverse reaction, to Remicade; (b) the physician must attest that Inflectra would not lead to the same adverse responses; and (c) the patient must show no loss of favorable response in established maintenance therapy with Remicade and must not have developed neutralizing antibodies to any infliximab biosimilar product that has made the therapy less effective.  As a practical matter, this meant that Inflectra, a drug the FDA approved as having no clinically meaningful differences in safety and efficacy (and which UnitedHeathcare had previously classified "at parity" with Remicade), would not be reimbursed for UnitedHealthcare's more than 30 million commercial medical members and that Remicade would be the exclusive infliximab with UnitedHealthcare – despite the lack of any medical basis for denying those members access to a lower-priced alternative to Remicade.

46. J&J has employed the same approach to secure exclusive deals with other major insurers. In most cases these coercive biosimilar-exclusion contracts were the only economically viable option for the insurers – as adopting any alternative would have required the insurer to incur a substantial penalty (*i.e.*, foregoing rebates to existing Remicade patients) that could not have been offset by the per-unit cost savings available on the number of patients likely to use the biosimilar, at least in the near term.

47. In addition to the exclusive contracts, J&J also used other means to exclude infliximab biosimilars and maintain and enhance its monopoly. J&J was able to effectively leverage its large base of existing patients who are stabilized on Remicade. For new patients who may be candidates for infliximab – Pfizer calls these patients the "contestable" demand, Pfizer focused, among other things, on competing for a substantial share of new patient starts by pricing Inflectra competitively with both insurers and providers on a unit-for-unit basis. The fact that Inflectra's ASP was lower than Remicade's, and that Renflexis went to market at a price 35% below Remicade's, showed the cost savings available.

48. To counteract this potential competition, J&J threatened insurers to withhold attractive rebates on all Remicade prescriptions – including those for existing patients as well as new ones – unless an insurer agreed to exclusivity. In this way J&J was able to leverage the incontestable demand for Remicade (the existing patients) to exclude competition for the contestable demand (the new patients), *i.e.*, J&J bundled the contestable and incontestable demand. Even if Pfizer offered a significantly lower price for Inflectra unit-for-unit, as it has done, insurers agreed to J&J's exclusive deals to avoid losing rebates on the substantial base of existing Remicade patients who were not likely to switch to Inflectra despite the presence of the lower-priced biosimilar. A recent article by two Yale Medical School professors in the *Journal of the American*

*Medical Association* illustrates how the kind of leverage J&J had over existing stable Remicade patients allowed it to extract commitments to exclude the biosimilar:

> If a biosimilar manufacturer intends to upend the preferred position of the brand by offering a substantial price discount to the [insurer], the branded manufacturer can respond by withdrawing the rebate on the [branded] biologic, creating a "rebate trap." For any patient continuing the [branded] biologic, a payer's cost for that patient will double once the rebate is withdrawn . . . . Even in [an] optimistic scenario, in which the price of the biosimilar is 60% less than the price of the brand after rebates and discounts, if the payer is only able to convert 50% of its patient users to the biosimilar [because existing patients will tend to stay on the original branded product], the rebate trap ensures that payer total costs actually increase relative to costs prior to biosimilar availability.

> To avoid the rebate trap, any strategy to reduce spending on biologics through adoption of biosimilars requires a near-complete switch of patient users from the branded biologic to the biosimilar. However, for many chronic diseases, the proportion of patients new to a given biological therapy is less than 20% of the total patients taking that drug in a given year. The remainder represents a stable base of patients whose disease is well-maintained while they are using current therapy and thus are unlikely to switch [to the biosimilar].[1]

49.     J&J further insulated itself from competition with respect to Remicade by bundling, in its contracts with insurers, rebates for Remicade with rebates on other products in return for commitments by insurers not to cover Inflectra. As part of its "Biosimilar Readiness Plan," the company thus leveraged other products to ensure its monopoly with respect to Remicade. J&J threatened insurers with the loss of rebates on other drugs, as well as Remicade, if they did not agree to exclude Inflectra from coverage. As J&J's Worldwide Chair for Pharmaceuticals said on an earnings call, "We are fully prepared to execute our focused biosimilar readiness plan," including "developing innovative contracts . . . [to] utilize the full breadth of our portfolio." The

---

[1]     Aaron Hakim & Joseph S. Ross, *Obstacles to the Adoption of Biosimilars for Chronic Diseases*, Journal of the American Medical Association (May 1, 2017), http://jamanetwork.com/journals/jama/article-abstract/2625049.

"full breadth of [J&J's] portfolio" included several drugs for which Pfizer does not offer any directly competing alternative.

50.     J&J's multi-product bundling, along with its bundling of contestable demand (*i.e.*, new patients) and incontestable demand (*i.e.*, existing Remicade patients), has amplified the anticompetitive effects of J&J's exclusive contracts and made the exclusivity provided by those contracts even more incontestable.  Because of the combined effect of these bundles, Pfizer could not offset the financial penalties that J&J threatened to impose on insurers who did not agree to exclusivity.  As a result, Pfizer was economically prohibited from competing for coverage by the major insurers – even when their exclusive contracts with J&J expired.

51.     J&J's tactics are continuing, using the same bundling strategies to ensure continuation of the exclusionary pattern.

52.     As alleged above, providers are unwilling to stock a drug product where there is significant uncertainty about whether it will be reimbursed by health insurers.  As a result, where a significant portion of a provider's patients are insured by plans that have agreed to exclude Inflectra or Renflexis – pursuant to the types of contracting tactics by J&J described above – the provider is unlikely to offer the competing products to any of its patients to avoid being caught with no reimbursement.

53.     *Bloomberg* has reported this result, noting that Ascension Health, a nearly 23,000-bed nonprofit hospital system based in St. Louis, spends $55 million a year on J&J's Remicade, more than any other drug.  "Using Inflectra, part of a new class of medicines called biosimilars, would save it [Ascension Helath] at least $10 million annually, according to Ascension's chief pharmacist, Roy Guharoy."  The article noted that Guharoy planned to integrate Inflectra into care more extensively until learning that insurers preferred to stay with Remicade.  "This we did not

19

expect," Guharoy said.    "If the insurance companies force us to use the branded product [Remicade], of course our hands are tied."

54.    USB Global Research noted the same constraints, stating that "contracting and coverage [by insurers] will play a greater role in driving choice of therapy than the preferences of physicians or patients."

55.    J&J touted in its marketing communications its exclusion of Inflectra, knowing that doing so would discourage providers from stocking the new biosimilar.  Thus, J&J advertised that Remicade is "Preferred Over Inflectra . . . Inflectra requires trial and failure on Remicade prior to [Inflectra] utilization."  The "fail first" requirement that J&J touted had no medical justification as the FDA had determined that there were no clinically meaningful differences between the two products.

56.    Given the extensive gaps in Inflectra's insurance coverage – caused by J&J's exclusionary scheme – providers using infliximab have overwhelmingly chosen to stock only Remicade (which is essentially universally covered given its long tenure and dominant position), rather than deal with the risk of possible denials of coverage for Inflectra.  Thus, providers have declined to purchase Inflectra across the board, even for patients covered by commercial or government insurance plans that do cover the product.  The effective foreclosure of biosimilars thereby is expanded well beyond the 70% of commercially insured patients directly foreclosed by J&J's insurer contracts.  Indeed, as of September 1, 2017, approximately 90% of healthcare provider accounts using infliximab had purchased no Inflectra at all.

57.    In addition to its exclusionary, competition-killing contracts with insurers, J&J has imposed exclusionary contracts on providers (*e.g.*, clinics, hospitals, etc.).  After Pfizer introduced Inflectra, J&J began offering certain large providers additional rebates and/or discounts on

Remicade, but only if the provider committed to buy Remicade for nearly all of its infliximab needs. To be eligible for rebates, J&J required providers to maintain purchase levels for Remicade at very close to the levels of the year before Inflectra's launch – when Remicade was the only infliximab option. With about 30% of prescriptions in any year representing new patients (and a certain percentage of existing patients exiting therapy each year), this condition also requires providers to use Remicade for new patients if they wish to secure payment from J&J, thus bundling contestable and incontestable demand for Remicade. Like J&J's contracts with insurers, these contracts as a practical matter make Remicade the exclusive infliximab with participating providers.

58.    J&J also used multi-product bundling in its provider contracts. As one analyst reported, J&J "bundled several drugs and medical devices together for larger hospitals, which made using [Inflectra] 'less economical.'" Conditioning rebates linked to other J&J products upon a promise not to do business with Inflectra exacerbates the exclusionary nature of J&J's contracts.

59.    Meanwhile, Pfizer sought to negotiate with providers to make Inflectra the lower priced infliximab option on a per-unit basis, offering to guarantee that Inflectra would be less expensive unit-for-unit than Remicade. But as with insurer contracts, to secure the right to deal freely with respect to Inflectra (*i.e.*, principally as to new patients), the providers would lose significant J&J rebates on their existing Remicade patient bases.

**The Impact of J&J's Exclusionary Conduct on the Infliximab Market, the Fund, and the Proposed Classes**

60.    J&J's conduct, as alleged above, has caused substantial harm to competition as well as to purchasers, including the Fund, who have been deprived of the principal benefits of competition – more choices and lower prices. The anticompetitive effects of J&J's conduct are evident in its pricing of Remicade since Inflectra's (and more recently Renflexis's) entry into the

market.  Despite the fact that Pfizer has offered substantial discounts and a lower ASP to compete for business with insurers and healthcare providers, J&J has been able to increase the price of Remicade without losing any significant share or volume of sales to Pfizer (or any other competitor).  J&J has increased Remicade list prices twice since FDA approval of Inflectra.  These increases alone raised Remicade's list price nearly 9%.

61.    There is no efficiency or cost-reducing justification for J&J's coercive and exclusionary insurer- or provider-level contract terms. J&J has not achieved improved production costs or economies of scale or scope through its contracting strategies.  J&J also has achieved no improvements in the Remicade treatment through its contracting strategies.  The intent and effect of J&J's conduct was to maintain and strengthen its monopoly position for infliximab.

62.    As a consequence of J&J's exclusionary conduct alleged above, the Fund and members of the classes alleged in this Complaint have been deprived of a competitive market for infliximab and the benefits of such a competitive market, including lower prices and more choices, and have been forced to pay supra-competitive prices for Remicade.

63.    As a consequence of J&J's exclusionary conduct alleged above, the Fund and members of the classes alleged in this Complaint have been injured in the business and property by paying inflated, supra-competitive prices for Remicade.

64.    J&J's exclusionary conduct alleged above is continuing and unless enjoined will continue in the future, causing continuing harm to the Fund and the members of the classes alleged by the Fund.

**COUNT I**

**Violation of Sherman Act § 1, 15 U.S.C. § 1**
**Unreasonable Restraint of Trade**

65.    The Fund realleges the allegations of preceding paragraphs of this Complaint.

66.     J&J's exclusionary agreements with insurers and providers, as alleged in this Complaint, constitute contracts, combinations and agreements in unreasonable restraint of trade in violation of § 1 of the Sherman Act, harming competition and harming the Fund and members of the Injunction Class alleged by the Fund in their businesses and property.

67.     The harm to the Fund and the members of the injunction class is continuing and the Fund and the Injunction Class seek equitable relief to correct the harm to competition and to their business and property and to keep that harm from continuing.

## COUNT II

### Violation of 15 U.S.C. §2, 15 U.S.C. § 2
### Monopolization

68.     The Fund realleges the allegations of the preceding paragraphs of this Complaint.

69.     J&J has monopolized the infliximab market in violation of § 2 of the Sherman Act.

70.     Through the scheme alleged in this Complaint, J&J has unlawfully maintained and enhanced its monopoly power in violation of § 2 of the Sherman Act.  J&J's scheme constitutes unlawful exclusionary conduct within the meaning of § 2 of the Sherman Act.

71.     As a result of J&J's conduct, and the harm to competition caused by that conduct, the Fund and the injunction class have suffered substantial and continuing harm to their business and property.

72.     The harm to the Fund and the members of the Injunction Class is continuing and the Fund and the Injunction Class seek equitable relief to correct the harm to competition and to their business and property and to keep that harm from continuing.

## COUNT III

### Violation of Clayton Act § 3, 15 U.S.C. § 14
### Unlawful Exclusive Dealing

73.     The Fund realleges the allegations of the preceding paragraphs of this Complaint.

23

74.    J&J's agreements with insurers and providers, as alleged in this Complaint, constitute agreements to fix prices, grant discounts or rebates on the condition, agreement or understanding that the providers or insurers would not use or deal with the goods of J&J's infliximab competitors, including Pfizer and Samsung

75.    As a result of J&J's conduct, and the harm to competition caused by that conduct, the Fund and the Injunction Class have suffered substantial and continuing harm to their business and property.

76.    The harm to the Fund and the members of the Injunction Class is continuing and the Fund and the Injunction Class seek equitable relief to correct the harm to competition and to their business and property and to keep that harm from continuing.

**COUNT IV**

**Violation of State Antitrust and Unfair Practices Statutes**

77.    The Fund realleges the allegations of the preceding paragraphs of this Complaint.

78.    During the period from April 5, 2016 to the present, J&J has sold Remicade in each of the following jurisdictions:  Alabama, Arizona, California, the District of Columbia, Guam, Hawaii, Iowa, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, the U.S. Virgin islands, Vermont, West Virginia and Wisconsin.

79.    During the period from April 5, 2016 to the present, the Fund has paid for or reimbursed a person or entity for Remicade administered in one or more of the following jurisdictions:  Alabama, Arizona, California, the District of Columbia, Guam, Hawaii, Iowa, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North

Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, the U.S. Virgin Islands, Vermont, West Virginia and Wisconsin.

80.    J&J's exclusionary conduct, as alleged in this Complaint, caused the Fund and members of the Damages Class the Fund alleges to pay inflated, supra-competitive prices for Remicade, constituting harm to competition and harm to the business and property of the Fund and members of the Damages Class the Fund alleges in violation of the antitrust and/or unfair practices laws of the following jurisdictions:  Alabama, Arizona, California, the District of Columbia, Guam, Hawaii, Iowa, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, the U.S. Virgin Islands, Vermont, West Virginia and Wisconsin.

81.    J&J's exclusionary conduct, as alleged in this Complaint, constitutes violations of the following state statutes:

(a)    <u>Alabama</u>:  Ala. Code § 6-5-60, with respect to members of the damages class the Fund alleges who suffered injury in Alabama;

(b)    <u>Arizona</u>:  Ariz. Rev. Stat. Ann. §44-1402, *et seq.*, with respect to members of the damages class the Fund alleges who suffered injury in Arizona;

(c)    <u>California</u>:  Cal. Bus. & Prof. Code §16720, *et seq.*, with respect to members of the damages class the Fund alleges who suffered injury in California;

(d)    <u>District of Columbia</u>:  D.C. Code §28-4509(a), with respect to members of the damages class the Fund alleges who suffered injury in the District of Columbia;

(e)    <u>Florida</u>:  Fla. Stat. §542.15, *et seq.* and Fla. Stat. §501.201, *et seq.*, with respect to members of the damages class the Fund alleges who suffered injury in Florida;

(f)      <u>Guam</u>:  9 Guam Code Ann. §69.20, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Guam;

(g)      <u>Hawaii</u>:  Haw. Rev. Stat. §480-3, *et seq*. and Haw. Rev Stat. §480-1, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Hawaii;

(h)      <u>Iowa</u>:  Iowa Code §553.2, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Iowa;

(i)      <u>Kansas</u>:  Kan. Stat. Ann. §50-101, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Kansas;

(j)      <u>Maine</u>:  Me. Stat. tit. 10, §1101, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Maine;

(k)      <u>Michigan</u>:  Mich. Comp. Laws §445.771, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Michigan;

(l)      <u>Minnesota</u>:  Minn. Stat. §325D.57, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Minnesota;

(m)      <u>Mississippi</u>:  Miss. Code Ann. §75-21-9, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Mississippi;

(n)      <u>Nebraska</u>:  Neb. Rev. Stat. §§59-801–59-802, *et seq*. and Neb. Rev. Stat. §59-1601, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Nebraska;

(o)      <u>New Hampshire</u>:  Nev. Rev. Stat. §598A.210(2), *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in New Hampshire;

(p)    <u>New Mexico</u>:  N.M. Stat. Ann. §57-1-1, *et seq*. and N.M. Stat. Ann. §57-12-1, *et seq*.,  with respect to members of the damages class the Fund alleges who suffered injury in New Mexico;

(q)    <u>New York</u>:  N.Y. Gen. Bus. Law §340, *et seq*. and N.Y. Gen. Bus. Law §349, with respect to members of the damages class the Fund alleges who suffered injury in New York;

(r)    <u>North Carolina</u>:  N.C. Gen. Stat. §75-1, *et seq*. and N.C. Gen. Stat. §75-1.1, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in North Carolina;

(s)    <u>Rhode Island</u>:  R.I. Gen. laws § 6-36-1 *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Rhode Island;

(t)    <u>Tennessee</u>:  Tenn. Code Ann. §47-25-101, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Tennessee;

(u)    <u>U.S. Virgin Islands</u>:  V.I. Code Ann., tit. 11, §1507(4), *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in the U.S. Virgin Islands;

(v)    <u>Utah</u>:  Utah Code Ann. §76-10-911, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Utah;

(w)    <u>Vermont</u>:  Vt. Stat. Ann. tit. 9, §2451, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in Vermont;

(x)    <u>West Virginia</u>:  W. Va. Code §47-18-20, *et seq*., with respect to members of the damages class the Fund alleges who suffered injury in West Virginia;  and

(y)    <u>Wisconsin</u>:  Wis. Stat. Ann. §133.03(1), *et seq*.,  with respect to members of the damages class the Fund alleges who suffered injury in Wisconsin.

## PRAYER FOR RELIEF

WHEREFORE, The Fund requests that the Court enter judgment on The Fund's behalf and on behalf of the Classes alleged herein, adjudging and decreeing that:

A.    The Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes.

B.    The unlawful conduct alleged herein be adjudged and decreed:

(1)    An unreasonable restraint of trade or commerce and monopolization in violation of §§ 1 and 2 of the Sherman Act;

(2)    Unlawful exclusive dealing in violation of § 3 of the Clayton Act;

(3)    Unlawful anti-competitive conduct, monopoly maintenance and unfair competition in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

C.    The Fund and the members of the damages class recover damages and/or disgorgement and/or restitution, to the maximum extent allowed under such laws, and that a judgment in favor of The Fund and the members of the damages class be entered against the Defendants in an amount to be trebled to the extent such laws permit.

D.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct, alleged herein, or from entering into any other contract or engaging in any other conduct, having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

28

E.    The Fund and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint.

F.    The Fund and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law.

G.    The Fund and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper

## JURY DEMAND

The Fund demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  December 7, 2017                     Respectfully submitted,

                                            SHEPHERD, FINKELMAN, MILLER
                                            & SHAH, LLP

                                            */s/Natalie Finkelman Bennett*
                                            Natalie Finkelman Bennett (#57197)
                                            James C. Shah (#80337)
                                            Jayne A. Goldstein (#48048)
                                            35 E. State Street
                                            Media, PA 19063
                                            T: 610-891-9880
                                            F: 866-300-7367
                                            nfinkelman@sfmslaw.com
                                            jshah@sfmslaw.com
                                            jgoldstein@sfmslaw.com

Joseph Goldberg (*pro hac vice* forthcoming)
Vincent J. Ward (*pro hac vice* forthcoming)
Frank T. Davis (*pro hac vice* forthcoming)
Nicholas T. Hart (*pro hac vice* forthcoming)
Jeremy D. Farris (*pro hac vice* forthcoming)
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
T: 505-842-9960
F: 505-842-0761
jg@fbdlaw.com
vjw@fbdlaw.com
ftd@fbdlaw.com
NickH@fbdlaw.com
jdf@fbdlaw.com

Charles R. Peifer (*pro hac vice* forthcoming)
PEIFER, HANSON & MULLINS, P.A.
20 First Plaza, Suite 725
Albuquerque, NM 87102
T: 505-247-4800
F: 505-243-6458
cpeifer@peiferlaw.com